1

```
 1            IN THE UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF MISSOURI
 2

 3

 4       SAMANTHA ZAMORA,

 5            Plaintiff,

 6        vs.                      Case No.
                                   3:16-CV-05028-RK
 7   STELLAR MANAGEMENT GROUP,
     INC. D/B/A QUALITY SERVICE
 8   INTEGRITY, et al.,

 9            Defendants.

10

11

12

13

14           VIDEOTAPED DEPOSITION OF
                MR. DAVID DE LEON,
15   produced, sworn, and examined on Tuesday,

16   November 22, 2016, at 10:32 a.m. of that day,

17   at the offices of the Paul Law Firm, Fourth and

18   Main Street, Pineville, Missouri, before me,

19   VICKIE L. SALMONS, CCR, in the above-captioned

20   cause; taken on behalf of the Defendants.

21

22               VOLUME I

23       ALPHA REPORTING SERVICE
         3230-G South National
24       Springfield, Missouri 65807
            (417) 887-4110
25
```

EXHIBIT
**2**

**Alpha Reporting Service**
417-887-4110    www.alphareportingservice.com    417-889-4246
Case 3:16-cv-05028-RK   Document 96-2   Filed 12/15/16   Page 1 of 30

```
1       ask you to please ask me to clarify it or let me know
2       that you don't understand it.  Is that all right?
3   A.  Yes.
4   Q.  If you need a break at any time, just let me know.
5       Okay?
6   A.  Yes.
7           MR. ROSKENS:  Let's go ahead and mark that, I
8       guess, just 15.
9               (Exhibit 15 marked for identification.)
10  Q.  (By Mr. Roskens) David, I'm going to show you what
11      we've marked as Exhibit 15 and ask you if you've seen
12      that subpoena before.
13  A.  Yes.
14  Q.  And were you served with that subpoena on or about
15      September 30, 2016?
16  A.  Yes.
17  Q.  That subpoena required you to produce certain
18      documents, text messages, e-mails that are listed on
19      the subpoena at my office on October 17, 2016.  Do
20      you see that?
21  A.  Yes.
22  Q.  After you received that subpoena, did you contact
23      anyone or talk to anyone about the subpoena?
24  A.  No.
25  Q.  Did you text message with anyone?
```

**Alpha Reporting Service**
**417-887-4110**     **www.alphareportingservice.com**     **417-889-4246**
Case 3:16-cv-05028-RK   Document 96-2   Filed 12/15/16   Page 2 of 30

1  A.   Yes, yes.

2  Q.   Did you after receiving that subpoena on

3       September 30th delete any text messages, Facebook

4       messages, e-mails, letters, or other correspondence

5       with Samantha Zamora, her husband, or her attorneys?

6  A.   No.

7  Q.   Now, you were also served with a check in the amount

8       of $147.57, correct?

9  A.   Yes.

10 Q.   What did you do with that check?

11 A.   I used it to work on my car.  I didn't have it on

12      time.

13 Q.   So you -- you cashed it or deposited it?

14 A.   Yes, yes.  I -- I bank with Arvest.

15 Q.   What happened to the text messages that you did have

16      with Samantha Zamora?  Did you delete them at some

17      time?

18 A.   I never did.

19 Q.   You never text messaged with Samantha?

20 A.   No, no.  What I'm saying, I never deleted those.

21 Q.   So what happened to them?

22 A.   They're on my phone.

23 Q.   So you think there are text messages between yourself

24      and Samantha on your phone?

25 A.   Yes.

**Alpha Reporting Service**
**417-887-4110**      **www.alphareportingservice.com**      **417-889-4246**
Case 3:16-cv-05028-RK   Document 96-2   Filed 12/15/16   Page 3 of 30

1    Q.    Why did you not produce them?

2    A.    Producing my cell?

3    Q.    Yes.  Why did you not produce copies of your text

4          messages?

5    A.    Because when they said regards to my phone, I went to

6          Verizon.  And they said that if somebody wanted --

7          'cause I told them it was an issue regards -- you

8          know -- how can I put it -- attorneys being involved.

9          They said that if they want them, they'll ask for

10         them.  But they -- we can't give them to you.

11                So I told them, Well, give me whatever you can

12         from my phone.  And they gave me Dave's phones.  He

13         goes, But it won't show the lettering as what you

14         text.  But it goes info -- as the phone number you

15         contacted.

16                MR. ROSKENS:  Let's mark that as 16.

17                THE WITNESS:  And I ask to the --

18                THE REPORTER:  Excuse me.

19                     (Exhibit 16 marked for identification.)

20   A.    I -- me -- I went up to the manager and asked him.

21         Well, this is a serious issue.  I need what I texted

22         so I can prove it was not -- they -- he goes, I'm the

23         manager.  I went to the Verizon store in Rogers.  He

24         goes, They know the process.  They know what to do.

25         That's what he told me.

1   Q.   (By Mr. Roskens) Let me hand you what we've marked as

2        Exhibit 16.  That is a second subpoena that was

3        served on you as well, correct?

4   A.   Yes.

5   Q.   And that subpoena required you to produce the same

6        documents, but they were to be produced on

7        November 15 at the location where we're currently at,

8        the Paul Law Firm, correct?

9   A.   Yes.

10  Q.   And you appeared here last week, on the 15th.  You --

11  A.   Yes.

12  Q.   Correct?

13  A.   Yes.

14  Q.   And you brought with you some documents; is that

15       right?

16  A.   Yes.

17            MR. ROSKENS:  Let's mark that as 17.

18                 (Exhibit 17 marked for identification.)

19  Q.   (By Mr. Roskens) David, I'm handing you what we've

20       marked as Exhibit 17.  Is that the group of documents

21       that you brought with you last week in response to

22       the subpoena previously served upon you?

23  A.   Yes.  This is it.

24  Q.   And you received those documents from Verizon; is

25       that right?

1        my intention wasn't to memorize that number.

2    Q.   Does your phone still have text messages on it

3        between yourself and Samantha?

4    A.   Truthfully, they -- they're there.

5    Q.   They're there, yes?

6    A.   They're there, yes.

7    Q.   Do you understand that both subpoenas that were

8        served upon you requested you to produce copies of

9        those text messages?

10   A.   After reading on this one, yes.

11   Q.   Is there a reason why you have not produced --

12   A.   Uh-huh.

13   Q.   -- those text messages either by October 17 or today?

14   A.   Because in my mind, was to do it right.  And it was

15       through -- go through Verizon.  This is what they

16       provided me.  And when the manager told me that they

17       couldn't do it and if whoever was requesting for it,

18       they said that they would have to do it.  I look at

19       it upon as, you know, I can only do so much as go to

20       Verizon.  And this is my -- my info as in detail from

21       text or call, whatever, everything.  It's right here.

22   Q.   Do you know how to either e-mail or forward on text

23       messages that are on your phone?

24   A.   Yes.  But I don't do it as --

25   Q.   Well, is the reason that you haven't produced text

Alpha Reporting Service
417-887-4110      www.alphareportingservice.com      417-889-4246
Case 3:16-cv-05028-RK   Document 96-2   Filed 12/15/16   Page 6 of 30

1      messages here today because you just didn't know how

2      to do it?

3  A.   I think I know how to do.  But I don't do it -- say

4      that I do it often.

5  Q.   Well, then my question to you is, that after

6      receiving the subpoenas, why did you not produce the

7      text messages as you're required to do in the

8      subpoenas?

9  A.   Well, to me, going back, I think this was enough

10     evidence on --

11 Q.   You would agree with me that Exhibit 17 doesn't

12     actually detail any of the text messages sent or

13     received from your phone as far as the content, does

14     it?

15 A.   Yes.

16 Q.   You're agreeing with me?

17 A.   Yes, I am.  I -- I respect that.

18 Q.   And as we sit here today, you can't tell me which

19     number on the cell -- or on Exhibit 17 represents

20     Samantha Zamora's cell phone number, if any of those

21     numbers, can you?

22 A.   No.

23 Q.   Now, after you received the subpoena that we've

24     marked as Exhibit 16 -- that's the one that required

25     you to produce documents last week -- did you speak

1   A.   They're both under my name.

2   Q.   Do you know the account number for your Verizon

3        account?

4   A.   No.

5   Q.   Would you be willing to sign an authorization

6        allowing Verizon to produce to me the information on

7        your phone, such as call information, call history,

8        cell -- or text history?

9   A.   Yes.  I'm willing.

10  Q.   Would you be willing to produce your phone so that an

11       expert could review it and try to retrieve text

12       messages between yourself, Samantha, her husband, or

13       her attorneys?

14  A.   Yes.  It depends too, 'cause I want my phone back.

15  Q.   I understand.  You would --

16  A.   Uh-huh.

17  Q.   -- want it -- you don't want it to be gone for very

18       long.

19  A.   Yes.  Certainly.

20  Q.   Would you be willing to produce it so that an expert

21       could look through it to determine if there were any

22       deleted text messages or other messages between

23       yourself, Samantha, her husband, or her attorneys?

24  A.   Yes.

25  Q.   I'm not a computer expert.

**Alpha Reporting Service**
**417-887-4110**       **www.alphareportingservice.com**       **417-889-4246**
Case 3:16-cv-05028-RK   Document 96-2   Filed 12/15/16   Page 8 of 30

1   A.   Uh-huh.

2   Q.   But from what I've been told, one of the faster ways

3        to do that is for the expert to take, like, a copy of

4        your phone and then just give it back to you.  But

5        that copies everything on your phone.  Would that be

6        something you'd be willing to do?

7   A.   Yes.  We're going back how long?  Is it that simple

8        to do?  I would like that, just --

9   Q.   Sure.

10  A.   -- 'cause I don't hand my phone to nobody.

11  Q.   I understand.  I don't know how long it takes.  My --

12  A.   Uh-huh.

13  Q.   -- understanding is that it could be about an hour.

14  A.   Oh.

15  Q.   Would that be all right?

16  A.   Yes, yes.

17  Q.   David, I'm going to show you a document that's been

18       previously marked as Exhibit C and ask you, do you

19       recognize that document?

20  A.   Yes.

21  Q.   And what is that document?

22  A.   I -- I sent this.  This is me writing right here.

23       This is my e-mail.

24  Q.   Is that a screen shot of your phone?

25  A.   Yes, it is.

**Alpha Reporting Service**
**417-887-4110**     **www.alphareportingservice.com**     **417-889-4246**
Case 3:16-cv-05028-RK   Document 96-2   Filed 12/15/16   Page 9 of 30

1    A.    Yes.

2    Q.    Is that my understanding?

3    A.    I respect that.  To cooperate, I will.

4    Q.    In your prior deposition you told me that the phone

5          number you gave Samantha in text message with her was

6          the 501 number, correct?

7    A.    It should have been the 479, because truthfully, on

8          the 501, like I say, I don't give that one out.

9          That's only to confidential, personal, personal

10         friends or family members.

11   Q.    You brought your 295-0688 phone with you to the last

12         deposition, didn't you?

13   A.    If I remember, I -- I did.

14   Q.    And do you remember specifically telling me when you

15         pulled that phone out that --

16   A.    Uh-huh.

17   Q.    -- any text messages between yourself and Samantha

18         would be on the other phone and you didn't have that

19         with you?

20   A.    Yes.

21   Q.    But that wasn't true?

22   A.    Yes.  At the time maybe didn't -- because I remember

23         the -- I was nervous, nervous.  But I think --

24         thinking it's 479.

25   Q.    As you sit here today, can you tell me that you did

1    Q.    After having a chance to review your prior

2          deposition, would you agree with me that in your

3          prior deposition you testified that the phone number

4          you gave Samantha was the 501 number?

5    A.    Yes.  And I was wrong.

6    Q.    You testified previously that you texted her with the

7          phone with that 501 number, correct?

8    A.    Yes.  And to be accurate, it wasn't that one.  It's

9          the 479, which -- everything should be here.

10   Q.    So your testimony today is that your prior testimony

11         was incorrect?

12   A.    Yes.  Everything should be here on the 479/295-0688.

13   Q.    And you had your 479 phone with you last time, didn't

14         you?

15   A.    Yes.

16   Q.    But you didn't bring it with you this time?

17   A.    No, no.  I don't have it with me.  It's in my

18         vehicle.  I just didn't want to be -- having somebody

19         call right now.  But it's -- it's on me.

20   Q.    Okay.  Well, if we take a break, would you be willing

21         to go get it?

22   A.    Yes.

23   Q.    Okay.

24   A.    Yes.  Certainly.

25               MR. BUCHANAN:  I believe there is a court order

Alpha Reporting Service
417-887-4110        www.alphareportingservice.com        417-889-4246
Case 3:16-cv-05028-RK   Document 96-2   Filed 12/15/16   Page 11 of 30

1    -- I'd have to look at the court order to refresh my

2    memory -- but that deals with the issue of examining

3    the witness's cell phone.

4         MR. ROSKENS:  The Court has required that I not

5    subpoena him to produce a cell phone.  However, he

6    has testified right here that he is willing to go

7    ahead and go get it.

8         MR. BUCHANAN:  Well, I don't think that's

9    consistent with the court order.  I think the court

10   order was entered because it was concerned with

11   Mr. De Leon's privacy and with the concern that he

12   might be intimidated by being required to furnish

13   private information.  And I --

14        MR. ROSKENS:  Well, let's --

15        MR. BUCHANAN:  -- believe your --

16        MR. ROSKENS:  -- just -- I'm going to cut --

17        MR. BUCHANAN:  -- request is not consistent with

18   the court order.

19        MR. ROSKENS:  I'm going to cut this off right

20   now, 'cause I know what you're doing.  And we will go

21   ahead and just call the Court right now and see if we

22   can get an emergency phone call in.  Let's go off the

23   record.

24        THE VIDEOGRAPHER:  We're off.

25             (Discussion off the record.)

**Alpha Reporting Service**
**417-887-4110**     **www.alphareportingservice.com**     **417-889-4246**
Case 3:16-cv-05028-RK   Document 96-2   Filed 12/15/16   Page 12 of 30

1          page of that exhibit.  Can you do that now?

2      A.   Yeah.

3                    (Pause in proceedings.)

4      Q.   (By Mr. Roskens) There must be a lot of text messages

5           between you and Samantha; is that true?

6      A.   Yes.  And I'm up front.  You can look at them

7           whenever you want.  They're available for you.  I

8           don't have nothing to hide.  Whatever you want to

9           see.  I'm saying whatever you want is here.  I'm

10          willing to -- I can't find it, I mean, for whatever

11          reason.  But if you want to look at it, go for it.

12     Q.   I am prohibited by the Court from looking --

13     A.   Okay.

14     Q.   -- at your phone.  I wish I could.  But I apologize.

15          I cannot.  So we'll just have to have you look

16          through it and see if you can find it.

17     A.   I apologize.  I can't find it.  But when you get the

18          technician, it's -- all the info will be here.  I'm

19          not going to delete any -- I don't delete anything.

20          So everything will be here for you.

21     Q.   When is the first text message between yourself and

22          Samantha --

23     A.   That I --

24     Q.   -- that you have on your phone?

25     A.   That I can find.  Wednesday, June 29.  The time will

Alpha Reporting Service
417-887-4110        www.alphareportingservice.com        417-889-4246
Case 3:16-cv-05028-RK   Document 96-2   Filed 12/15/16   Page 13 of 30

1          be 12:19 p.m.

2    Q.    That's 2016?

3    A.    Yes.  This year.

4    Q.    And what is that text message?

5    A.    I can -- this is her speaking, referring, Hola,

6          David.  It's Samantha.  This is my new number.  It's

7          saying -- if I can translate.  Oh, it's in English.

8          Hola, David.  Est means it's Samantha.  This is my

9          new number.

10   Q.    So had she texted you or communicated with you on a

11         different phone number before then?

12   A.    That, I don't -- I don't know.  She -- that's the

13         beginning.  That's what she said.

14   Q.    Okay.  And what else does she say in that text

15         message?  You can just read them to the Court.

16   A.    I'm right here.  Ready?  The first one, I just read

17         it.  Hola, David.  I'm going to repeat myself again.

18         It's Samantha.  This is my new number.  I had some

19         issues and was forced to change my number.  Then it

20         says, My lawyer said he will be calling you.

21   Q.    And what is your response?

22   A.    Okay.  Is everything good?  I don't want to interfere

23         or get in your business.  I was worried about you.

24   Q.    By the context of that text message it would be fair

25         to say that you and Samantha had already talked

Alpha Reporting Service
417-887-4110        www.alphareportingservice.com        417-889-4246
Case 3:16-cv-05028-RK   Document 96-2   Filed 12/15/16   Page 14 of 30

1      before that text message, right?

2   A.   Yes.

3   Q.   And had you talked to Samantha about having her

4      attorney contact you or about getting in touch with

5      her attorney?

6   A.   Repeat that again.

7   Q.   Before that text message was sent to you, had you

8      spoken with Samantha about contacting Samantha's

9      attorney or having Samantha's attorney contact you?

10  A.   As of my knowledge, going back, I wouldn't remember.

11     But everything you want is here.  I -- I'm not going

12     to say something to put myself in a bind that -- if

13     I'm not proving the fact that -- yes or no.  I don't

14     know.

15  Q.   Well, you understand that during your last

16     deposition --

17  A.   Uh-huh.

18  Q.   -- you testified under oath that you did not have any

19     conversations with Samantha about her lawsuit or any

20     of the allegations in her lawsuit while you were

21     still employed at QSI.  Do you remember that?

22  A.   Yes.  If that's what it is, that's what it is.

23  Q.   You -- your text messages now show that that was a

24     lie.

25  A.   Uh-huh.

**Alpha Reporting Service**
**417-887-4110**        **www.alphareportingservice.com**        **417-889-4246**
Case 3:16-cv-05028-RK   Document 96-2   Filed 12/15/16   Page 15 of 30

1  Q.   Is that correct?

2  A.   Well, if it shows there, yes.  I'm not going to lie.

3  Q.   While you were still working at QSI you were

4       discussing with Samantha the lawsuit and her

5       allegations, correct?

6  A.   Yes.  But not in detail.  I didn't know -- she didn't

7       rephrase, this, this, this, to my knowledge.  To my

8       knowledge, she didn't say from beginning to end or

9       this is what I got, this is --

10 Q.   After you received that text message, did you talk to

11      her attorney?

12 A.   Yes, I did.

13 Q.   Who initiated that contact?

14 A.   I did.

15 Q.   You called him?

16 A.   I called him.

17 Q.   And what was the substance of that conversation?

18 A.   It was because I was terminated.

19 Q.   You were terminated in August, right?

20 A.   Yes.

21 Q.   But that text message is from June.

22 A.   Yes.

23 Q.   So you're telling me that although she says in her

24      June text message that her attorney's going to be

25      contacting you, he doesn't ever contact you?

Case 3:16-cv-05028-RK   Document 96-2   Filed 12/15/16   Page 16 of 30

1    everything okay -- no.  Okay.  Is everything good?  I

2    don't want to interfere or get in your business.  I

3    was worried.  Bye.

4 Q.  And what is her response?

5 A.  I have a question.  I don't mind if you just go

6    through --

7 Q.  I would -- I would love to do that.  But I can't,

8    David.  The Court won't let me do that.

9 A.  Because I'm --

10 Q.  It would be faster and easier.

11 A.  I --

12      MR. BUCHANAN:  Let me ask a question.

13 A.  I'm feeling -- I don't -- I'm not feeling

14    comfortable.  So if you want everything, I'm -- I'm

15    up for everything.  I -- I really don't want to be

16    doing this.

17      MR. BUCHANAN:  Let -- let me ask a question.  Do

18    you have a -- are you able on your cell phone to kind

19    of do a search that only has those e-mails and text

20    messages between you and Samantha?

21      THE WITNESS:  Everything's here.  I don't have

22    nothing.  Whatever -- whatever's requested --

23    everything is there.  But right now I'm not feeling

24    good right now.  I don't know if nervous or whatever.

25    But anything -- I'm up for whatever you're

1    requesting, whoever's requesting.  It's right here.

2    I don't have nothing to hide.

3        MR. ROSKENS:  I --

4        THE WITNESS:  I just don't feel comfortable

5    right now at this moment.

6  Q.  (By Mr. Roskens) What you're looking at is an entire

7    transcript of all the text messages between you and

8    Samantha, isn't it?

9  A.  Yes.

10 Q.  It goes all the way back to your first text message.

11    And it has all the way through the most recent text

12    message, right?

13 A.  If you want the last one -- I just don't feel

14    comfortable right now.  I'm shaking.  I don't have a

15    -- I get nervous quick.  And if you want to get the

16    first date like you think you wrote, you can have

17    anything you want, what you're requesting.

18        MR. BUCHANAN:  About -- could I just ask a

19    couple questions, just for --

20        MR. ROSKENS:  I believe there's a --

21        MR. BUCHANAN:  -- clarification?

22        MR. ROSKENS:  -- question pending right now.

23    He's looking to see when the most recent one was.

24 A.  Okay.  It will be Tuesday, November 15, 5:50 p.m.

25 Q.  (By Mr. Roskens) You obviously don't have any

1      objection to me reading through those text messages,

2      do you?

3   A.    Go for it.  Whatever you want.

4   Q.    You don't have any objection to Mr. Buchanan reading

5      through those text messages, do you?

6   A.    Huh-uh.

7          MR. ROSKENS:  It looks like somebody's calling

8      you.

9          THE WITNESS:  It's actually my boss.

10         MR. ROSKENS:  Do you need to answer that?  We

11     can go off the record if you need to answer.

12         THE WITNESS:  Yes.

13         MR. ROSKENS:  Okay.

14         THE WITNESS:  And I'll step outside, 'cause I

15     don't want to --

16         MR. ROSKENS:  We'll go off the record.

17         THE VIDEOGRAPHER:  We're off.

18             (Discussion off the record.)

19         THE VIDEOGRAPHER:  We're back on.

20         MR. BUCHANAN:  Can I ask a few questions, just

21     for the purpose of trying to figure out how we might

22     solve this problem without unnecessary work?  Is that

23     all right?

24         MR. ROSKENS:  Ready to go back on the record?

25         THE REPORTER:  We're on, yeah.

1         THE VIDEOGRAPHER:  We're on.

2    Q.   (By Mr. Roskens) We have taken a short break off the

3         record.  Mr. De Leon has informed us that he has to

4         leave by approximately two o'clock to go to work.  Is

5         that correct?

6    A.   Yes.

7    Q.   Mr. Buchanan has requested to ask some questions, I

8         guess to try to reach a compromise here on how we can

9         review these text messages between Mr. De Leon and

10        the plaintiff in a -- in a shorter or easier way.

11        I'm okay with that.

12                    EXAMINATION

13   BY MR. BUCHANAN:

14   Q.   Okay.  Mr. De Leon, about how many text messages do

15        you have on your cell phone there in front of you

16        between you and Samantha?

17   A.   Truthfully, a lot.

18   Q.   Okay.  More than a hundred?

19   A.   I don't know about that much.  But it might --

20   Q.   More than 20?

21   A.   Oh, no.  Yeah.  More than 20 too.

22   Q.   Okay.  More than 50?

23   A.   On a scale, in my opinion, maybe.

24   Q.   Okay.  And are they --

25   A.   A ballpark number, I'm going to say 75.

**Alpha Reporting Service**
417-887-4110        www.alphareportingservice.com        417-889-4246
Case 3:16-cv-05028-RK   Document 96-2   Filed 12/15/16   Page 20 of 30

1   Q.   Okay.  And are they all in a continuous chain?  In

2        other words --

3   A.   No, no.  At different grace periods.

4   Q.   But are there e-mails or text messages from anyone

5        other than Samantha in this list that you're looking

6        at on your telephone right now?

7   A.   Secure this -- on this phone, I don't have my

8        e-mails.  I have it on the other one.  So the e-mails

9        were never ever -- when you have your tech look at

10       it, they're never going to be there.  They're never

11       -- they're going to be in the other one.  So when I

12       provide my info, there's going to be two cell phones.

13       This has no e-mail setup at all.

14  Q.   So the e-mails are on a different phone?

15  A.   On a different phone, the 501.  We can document that.

16  Q.   Okay.

17  A.   And it has e-mails from Zamora, from her HR, because

18       they were trying to get me a job, from her husband,

19       trying to get me in his job.  And related to -- to

20       this getting involved.

21  Q.   Is it possible for you to e-mail or text message the

22       text messages that are on your phone?

23  A.   Oh, that I -- I'm not a -- a tech guy.  I can't do

24       that.  That's what I'm saying.  You guys can have my

25       phone.  I can't -- I don't know how to scroll through

Alpha Reporting Service
417-887-4110      www.alphareportingservice.com      417-889-4246
Case 3:16-cv-05028-RK   Document 96-2   Filed 12/15/16   Page 21 of 30

1       it and do that.  That's what I'm saying.  My phone is

2       provided for anybody that wants it.  Whoever wants

3       the info, it's right there.

4   Q.  Okay.

5   A.  But I don't know how to do that.

6   Q.  Okay.

7   A.  If I knew, that would have been maybe as -- like he

8       said earlier, if you were supposed to provide, that's

9       why I went to Verizon.  I said, Verizon's going to do

10      what they're going to do.  I stepped in there, talked

11      to the management department in regards -- that's --

12      they couldn't provide it.

13              MR. BUCHANAN:  Okay.  That's all that I had.

14                      EXAMINATION

15  BY MR. ROSKENS:

16  Q.  David, I had previously asked you to go ahead and

17      read some of the text messages on your cell phone.

18      And you indicated you weren't feeling well and didn't

19      want to do that; is that true?

20  A.  Yes.

21  Q.  As -- as we sit here today, if I asked you to read

22      additional text messages, will you refuse to do so?

23  A.  As I'm refusing now?

24  Q.  I'm asking you, will you refuse to do so, or will you

25      do it?

Alpha Reporting Service
417-887-4110        www.alphareportingservice.com        417-889-4246
Case 3:16-cv-05028-RK   Document 96-2   Filed 12/15/16   Page 22 of 30

1  A.    When I just -- I don't feel good right now.  Nervous.

2        Or I get nervous pretty quick, as you remember the

3        last time.  But that's what I'm saying.  My thing to

4        solve the problem, it's here.  Just have your tech

5        look at it.

6              MR. BUCHANAN:  Well, I have no objection if the

7        only text messages that -- that we're looking at are

8        those between David and Samantha.  I have no

9        objection to both of us looking at them and reading

10       it into the record.

11             Now, I realize that is somewhat inconsistent

12       with the judge's order.  I would doubt that the judge

13       would be upset if we reached some reasonable

14       accommodation of that nature.  But I'll leave it up

15       to you as to whether you want to do that.

16             MR. ROSKENS:  I'm not going to violate the

17       Court's order.  We had a discussion that

18       unfortunately, was not on the record here, but was

19       recorded, I believe, by the Court.  And I asked

20       specifically for that reason whether I could look at

21       the phone.  And the Court was very clear that we are

22       prohibited from doing so.

23             So I am not going to violate the Court's express

24       order.  If you want to read messages into the record,

25       I can't prevent you from doing so.

Alpha Reporting Service
417-887-4110       www.alphareportingservice.com       417-889-4246
Case 3:16-cv-05028-RK   Document 96-2   Filed 12/15/16   Page 23 of 30

1       I would also like to inquire into text messages

2   between Mr. De Leon and Samantha's husband, as well

3   as text messages between Mr. De Leon and

4   Andrew Buchanan and his firm and text messages

5   between Mr. De Leon and former and current employees

6   of my client.  So there's -- it's a little broader

7   scope than just Samantha.

8       THE WITNESS:  There's also HR from her

9   department too, if you want them.  Everything's

10  there.  I don't have nothing to hide.  Everything's

11  there.  Everything's there.

12      MR. ROSKENS:  I understand that you're willing

13  to provide it.  Unfortunately, we are bound by the

14  Court's order that prohibits us from looking at or

15  from downloading it from you.

16      THE WITNESS:  I have another question, man.  I

17  don't know how this works.  But I don't know if we're

18  going to see each other again or whatever.  But what

19  were you saying, that guy, if he can go in advance,

20  don't go two days before, because I got things to do

21  too.  My life -- he goes, like, two days before and

22  says, Oh, you got a court date.  I'm, like, come on,

23  man.  I got -- I got to go to work too.  I can't just

24  -- I can't afford to miss work just --

25  Q.  (By Mr. Roskens) You're talking about when you get

Alpha Reporting Service
417-887-4110      www.alphareportingservice.com      417-889-4246
Case 3:16-cv-05028-RK   Document 96-2   Filed 12/15/16   Page 24 of 30

1          served with --
2    A.    When -- when I get served, yeah, it has to be in
3          advance too.  I got my life.  You know, I live day by
4          day, you know.
5    Q.    I apologize for that.  Unfortunately, again, I was
6          ordered to do that by the Court --
7    A.    Uh-huh.
8    Q.    -- with less than a week before the deposition.
9    A.    Yeah, okay.  And I -- well -- and I thank you for --
10         now that I know, I got to respect that.  But what I'm
11         trying to say, it's personal life, you know.  I can't
12         afford to miss work.  I'm just putting it that way.
13         I know it was requested by you.  But in advance, you
14         know, I can call, 'cause this is making me look bad.
15         I can't afford to miss work.  That's just how it is,
16         you know.
17   Q.    I understand.  Mr. De Leon, I intend to ask you
18         questions about text messages on your phone between
19         yourself and Samantha, between yourself and
20         Samantha's husband, and between yourself and
21         Andrew Buchanan and between yourself and any
22         employees or former employees of my client, QSI.
23   A.    Uh-huh.
24   Q.    If I'm going to ask you to read those into the record
25         today, will you be willing to do so?

Alpha Reporting Service
417-887-4110     www.alphareportingservice.com     417-889-4246
Case 3:16-cv-05028-RK   Document 96-2   Filed 12/15/16   Page 25 of 30

1    A.    I don't want to do it today.

2    Q.    You don't want to do it today?

3    A.    No.

4    Q.    Would you be willing to do so at a later time, or is

5          it your preference that you just produce your phone

6          and have us look at it?

7    A.    Yes.  I -- consuming time, and it's easier.  I mean,

8          I don't know if it's favor for you.  But I -- take

9          it.  Even if you want to take it for a week, I don't

10         want nothing to do with it.

11   Q.    Mr. De Leon, if we are able to convince the Court to

12         allow us to do that, are you willing to reappear so

13         that I can ask you questions about text messages that

14         we obtain from your phone or e-mails?

15   A.    I want to cooperate and do my part.  So I will do it

16         for you.

17   Q.    You will?

18   A.    I will do it for you.  I want to come out clean.

19         When will be this date so I can put it on my

20         schedule?

21   Q.    I don't know.  We are kind of in a bind here with the

22         Court.  So --

23   A.    Oh, okay.

24   Q.    -- I don't know when the Court will rule on it.  I

25         don't know if the Court will even allow us to do it.

**Alpha Reporting Service**
417-887-4110      www.alphareportingservice.com      417-889-4246
Case 3:16-cv-05028-RK   Document 96-2   Filed 12/15/16   Page 26 of 30

1        So that's why we're in the situation we're in.  I'm

2        going to ask you a few more questions about

3        Exhibit 18, the text messages.

4    A.  Uh-huh.

5    Q.  Do you still have that in front of you?

6    A.  Yes.

7    Q.  Now, the bottom of the text message there, there's a

8        portion of the screen shot that looks to me like a

9        photo of a -- of a document.  Do you see that, on the

10       last page of Exhibit 18?

11   A.  Yes.

12   Q.  Did you sent that photo to Samantha?

13   A.  If it's coming from my phone, yes.  And I remember.

14       I think I did send that.

15   Q.  Did she ask you to send her photos of documents

16       having the names of individuals working at Noel?

17   A.  I did.

18   Q.  She asked -- you asked yourself?

19   A.  No, no, no, no.  I did.  I sent it myself.

20   Q.  I understand you sent it.  My question is, did she

21       ask you to send it?

22   A.  No.

23   Q.  You just sent that on your own accord?

24   A.  Yes.

25   Q.  Did Samantha ask you for the names of persons that

**Alpha Reporting Service**
417-887-4110        www.alphareportingservice.com        417-889-4246
Case 3:16-cv-05028-RK   Document 96-2   Filed 12/15/16   Page 27 of 30

1        were employed by my client, QSI?

2   A.   No.  I did.

3   Q.   You did what?

4   A.   I sent them.

5   Q.   I understand you sent them.  I'm asking you, did

6        Samantha ask you for the names of employees at QSI?

7   A.   No.

8   Q.   Did she ask you to send copies of sign-in sheets?

9   A.   No.  I did.

10  Q.   You did that on your own?

11  A.   I did it on my own.

12  Q.   For no reason?

13  A.   For no reason.

14  Q.   And in your last deposition I asked you multiple

15       times about what your text messages with Samantha

16       were.  And you didn't ever mention to me that you

17       were sending her photos of sign-in sheets or of

18       employees, did you?

19  A.   I don't remember.  But if it's from my phone, it's

20       me.

21  Q.   Well, can you tell me and the jury why it is that you

22       didn't disclose that you were taking pictures of

23       documents from QSI and sending them to Samantha?

24  A.   Why I didn't?  Repeat that again.

25  Q.   Why didn't you tell us last time when I asked you

Alpha Reporting Service
417-887-4110        www.alphareportingservice.com        417-889-4246
Case 3:16-cv-05028-RK   Document 96-2   Filed 12/15/16   Page 28 of 30

1      about your text messages that you had been taking

2      photos of documents, QSI documents, and sending them

3      to Samantha?

4    A.   Because at the time it didn't hit my head.  But I was

5         wrong for not maybe answering that properly.  But now

6         I'm rephrasing myself again right now.  I did it.  I

7         did wrong, if that's what it is.

8    Q.   Well, is this part of the reason why Samantha offered

9         you money, so that you would send her documents?

10   A.   No.

11   Q.   Did you send her any other documents?

12   A.   Whatever's going to come up there, that's what it is.

13   Q.   When you say Whatever's going to come up where?

14   A.   It's like you say this little picture right here

15        (indicating) that you just asked about documents,

16        that's one of them, yeah.  I send it myself.

17   Q.   Mr. De Leon, just so you understand, I've asked for

18        text messages between you and Samantha.  But

19        Samantha's only giving me what you're looking at

20        there for Exhibit 18.  Yet you've testified today

21        that in your own belief, there's approximately 75

22        text messages between you and Samantha, correct?

23   A.   Correct.

24   Q.   So I'm at a bit of a handicap.  I don't know what the

25        text messages are between you and Samantha.

**Alpha Reporting Service**
**417-887-4110      www.alphareportingservice.com      417-889-4246**
Case 3:16-cv-05028-RK   Document 96-2   Filed 12/15/16   Page 29 of 30

1       former QSI employee that you've attempted to contact,

2       correct?

3   A.  Yes.

4   Q.  And why were you trying to reach Erica?

5   A.  At the moment I don't even remember.  It had to be

6       for something.  Maybe related to this.

7   Q.  Did you ever reach her?

8   A.  I -- I did.  She sent me a text.  I think hers I did

9       delete.  But it will be there.  You say, the tech can

10      find everything.

11  Q.  You believe --

12  A.  I think I deleted hers.

13  Q.  If you've told us multiple times that you don't

14      delete anything, why would you have deleted your text

15      messages with Erica Ortiz?

16  A.  Okay.  Come on.  I don't -- I go to the thing that

17      every person that I text in the world are here.

18      Some.  Okay.  The majority.  I text today somebody.

19      Okay.  Well, I'm not going to go back right now and

20      say that one's saved.  Some of them are.  Not all of

21      them.  Some of them are.

22  Q.  My question to you, Mr. De Leon, was why did you

23      delete your text messages with Erica Ortiz?

24  A.  I don't have an answer for you right now.

25  Q.  When did you contact Erica Ortiz?